J-S31001-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN RE: ADOPTION OF M.A.G-S., A : IN THE SUPERIOR COURT OF
MINOR : PENNSYLVANIA
:
:
:
APPEAL OF: M.G., MOTHER :
:
:
:
:
: No. 856 EDA 2021

Appeal from the Decree Entered March 24, 2021
In the Court of Common Pleas of Montgomery County
Orphans' Court at No:  2020-A0092

BEFORE:   STABILE, J., KING, J., and PELLEGRINI, J.*

MEMORANDUM BY STABILE, J.:          **FILED NOVEMBER 29, 2021**

M.G. (Mother) appeals from the decree entered on March 24, 2021, in the Court of Common Pleas of Montgomery County, involuntarily terminating her parental rights to her daughter, M.A.G-S. (Child), born in June 2016.[1] Upon careful review, we affirm.

On July 14, 2020, Y.B. and N.B. (collectively, Appellees) filed the involuntary termination petition pursuant to 23 Pa.C.S. § 2511(a)(1), (2), and (b).  Appellees averred that they were granted primary custody of Child by custody order dated August 20, 2018, when she was twenty-two months old,

_____

* Retired Senior Judge assigned to the Superior Court.

[1] The court issued a separate decree involuntarily terminating the parental rights of D.L.S. (Father).  Father filed a notice of appeal, docketed at 1179 EDA 2021, which we address by separate memorandum.

and that Mother has not seen or visited Child since 2018. In addition, Appellees filed a report of intention to adopt. On September 8, 2020, Appellees filed a petition for adoption.

The court conducted an evidentiary hearing on January 21, 2021, *via* Zoom due to the COVID-19 pandemic. The guardian *ad litem* (GAL), Mary C. Pugh, Esquire, represented Child's legal and best interests.[2] Y.B. and N.B. testified on their own behalf. Mother and Father testified, and Father presented the testimony of his sister, K.S. (Paternal Aunt).

The following relevant facts and procedural history are undisputed. Mother was incarcerated at the time of Child's birth. Orphans' Court Opinion, 3/24/21, at 3 (citations to record omitted). Immediately after birth, Child's maternal grandfather and his wife (collectively, maternal grandparents) took Child into their home in Montgomery County. *Id.* Appellees were the neighbors of maternal grandparents, who babysat Child as a newborn at the request of maternal grandparents. *Id.* Mother was released from prison in

---

[2] The orphans' court appointed Attorney Pugh as Child's GAL/counsel on November 30, 2020. The court determined that Child's legal and best interests did not conflict. N.T., 1/21/21, at 46-47; *see also In re K.M.G.*, 240 A.3d 1218 (Pa. 2020) (affirming *In re K.M.G.*, 219 A.3d 662 (Pa. Super. 2019) (*en banc*) that appellate courts engage in *sua sponte* review to determine if an orphans' court has appointed counsel to represent the child's legal interests in a contested termination proceeding, in compliance with 23 Pa.C.S. § 2313(a). Further, where a guardian ad litem (GAL)/counsel was appointed to represent both the child's legal and best interests, appellate courts engage in *sua sponte* review to determine whether the orphans' court determined that those interests did not conflict.).

September 2016, when Child was three months old. N.T., 1/21/21, at 118. Mother, along with Child, went to reside with her mother, who also lived in Montgomery County. Orphans' Court Opinion, 3/24/21, at 3 (citations to record omitted).

Mother knew Appellees as her father's neighbors. Beginning in September 2017, Mother requested that Appellees babysit Child. *Id.* at 4. In November 2017, when Child was one year and five months old, Mother requested that Appellees assume full custody of Child on a temporary basis while she entered an inpatient drug rehabilitation facility. *Id.* Mother and Appellees executed a document to this effect, before a notary. *Id.* However, the notarized document was not introduced as an exhibit during the subject proceeding.

From November 2017, until March 2018, Mother resided in an inpatient drug rehabilitation facility in Florida. Orphans' Court Opinion, 3/24/21, at 5 (citations to record omitted). Mother then immediately entered a halfway house in Florida. *Id.* In May 2018, Mother entered an inpatient drug rehabilitation facility in California. *Id.*

Appellees maintained custody of Child until the spring or summer of 2018, when, as best we can discern, a custody action occurred between them and Paternal Aunt. On an unspecified date, the trial court awarded physical custody to Paternal Aunt, which lasted for five weeks. N.T., 1/21/21, at 54-

55. In August 2018, Appellees filed a petition for custody.[3] Orphans' Court Opinion, 3/24/21, at 4 (citations to record omitted). By agreed-upon order dated August 20, 2018, the court awarded Appellees sole legal and primary physical custody of Child, and Paternal Aunt partial physical custody on alternating weekends and on alternating Thursdays.[4] Orphans' Court Opinion, 3/24/21, at 4; N.T., 1/21/21, at 50-52, 66. Throughout the case, Paternal Aunt exercised partial custody on alternating weekends only. N.T., 1/21/21, at 66.

In December 2018, Mother returned to Montgomery County from California for the funeral of her sister. Orphans' Court Opinion, 3/24/21, at 5 (citations to record omitted). Approximately three or four days after the funeral, Mother was incarcerated in Montgomery County Correctional Facility for reasons unspecified in the record. *Id.*; N.T., 1/21/21, at 160. Mother remained incarcerated until April 2020, and for some of that period she was incarcerated in Chester County. *Id.* at 5. Upon release from prison,[5] Mother

---

[3] The record does not specify whether Appellees filed a petition to modify custody, or if they initiated a new custody action.

[4] A custody conference was held, during which Mother participated by telephone from the inpatient facility in California. N.T., 1/21/21, at 123-124. However, there is no indication in the record whether the August 20, 2018 order referenced Mother or not.

[5] Mother testified that she has three more years of probation remaining on her sentence. N.T., 1/21/21, at 138. She testified that her probation involved supervision for drug and alcohol issues. *Id.* at 133.

resumed living with her mother in Montgomery County, where she remained at the time of the subject proceeding on January 21, 2021. *Id.* at 6.

By decree dated and entered on March 24, 2021, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), and (b). The court accompanied the decree with an opinion. Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother raises the following issues for review:

1.      Whether there was sufficient evidence to support the findings of the [orphans' c]ourt that [Appellees] proved by clear and convincing evidence the requirements of 23 Pa.C.S.A. § 2511(a)(1) for the involuntary termination of [M]other's parental rights[?]

2.      Whether there was sufficient evidence to support the findings of the [orphans' c]ourt that [Appellees] proved by clear and convincing evidence the requirements of 23 Pa.C.S.A. § 2511(a)(2) for the involuntary termination of [M]other's parental rights[?]

3.      Whether there was sufficient evidence for the [orphans' c]ourt to conduct an analysis under 23 Pa.C.S.A. § 2511(b) and to support the findings of the [orphans' c]ourt that [Appellees] proved by clear and convincing evidence the requirements of 23 Pa.C.S.A. § 2511(b) that the developmental, physical and emotional needs and welfare of [Child] would be best served by the termination of [M]other's parental rights[?]

Mother's brief at 4-5.[6]

---

[6] The GAL filed a brief advocating for the decree to be affirmed.

We review the involuntary termination decree for an abuse of discretion.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted). This Court

has explained:

> [W]e must accept the findings of fact and credibility determinations of the orphans' court if the record supports them. *T.S.M.*, 71 A.3d at 267. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *M.G.*, 855 A.2d [68,] 73-74 [Pa. Super. 2004] (citation omitted).

*In re K.M.G.*, 219 A.3d 662, 672 (Pa. Super. 2019) (*en banc*).

Termination of parental rights is governed by Section 2511 of the

Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511).

The burden is upon the petitioner to prove by clear and convincing evidence

that the asserted statutory grounds for seeking the termination of parental

rights are valid. *In re R.N.J.*, 985 A.2d at 276.

We need only agree with the orphans' court as to any one subsection of

Section 2511(a), as well as Section 2511(b), to affirm. *In re B.L.W.*, 843

A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, we review the decree

pursuant to Section 2511(a)(1) and (b),[7] which provide:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

---

[7] Based on this disposition, we need not address Mother's second issue on appeal which relates to Section 2511(a)(2).

23 Pa.C.S. § 2511(a)(1), (b).

With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citing *In re Adoption of R.J.S.*, 901 A.2d 502, 510 (Pa. Super. 2006)).

Parental rights may be terminated pursuant to Section 2511(a)(1) "if the parent either demonstrates a settled purpose of relinquishing parental claim to a child **or** fails to perform parental duties." *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003) (emphasis added). Regarding the definition of "parental duties," this Court has stated:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order

to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (internal citations omitted). We have explained, "Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision." *In re N.M.B.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

In *In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012), our Supreme Court discussed *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975), a case wherein the Court considered the issue of the termination of parental rights of incarcerated persons involving abandonment, which is currently codified at Section 2511(a)(1). The *S.P.* Court stated:

Applying in *McCray* the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." *Id.* at 655. We observed that the father's incarceration made his performance of this duty "more difficult." *Id.*

*In re Adoption of S.P.*, 47 A.3d at 828. The *S.P.* Court continued:

[A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of

- 9 -

abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. **Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child.** Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

[**McCray**] at 655 (footnotes and internal quotation marks omitted). . . .

**In re Adoption of S.P.**, **supra** (emphasis added).

Finally, this Court has explained that, once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: "(1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b)." **In re Z.S.W.**, 946 A.2d at 730 (quoting **In re Adoption of Charles E.D.M.**, 708 A.2d 88, 92 (Pa. 1998)).

Instantly, with respect to Section 2511(a)(1), Mother argues the court abused its discretion in terminating her parental rights because it was never her intent to allow Appellees to have custody of Child on a permanent basis, and she took all available steps to maintain a place of importance in Child's life. Mother's brief at 20. Mother asserts that, for the majority of this case, she was either incarcerated or residing in an inpatient rehabilitation facility, including the six-month period immediately preceding the filing of the

termination petition, *i.e.*, January 14, 2020, until July 14, 2020. ***Id.*** at 14, 17. She states she was not permitted to contact anyone from the inpatient rehabilitation facilities. However, Mother asserts she contacted Appellees "here and there" from the halfway house. ***Id.*** at 17-18. Mother claims she telephoned Appellees from prison, "but they wouldn't answer." ***Id.*** at 19. In addition, Mother claims she was unable to send letters to Child from prison at Appellees' address because they had moved.

The orphans' court found that Mother demonstrated a settled purpose to relinquish her parental rights to Child by failing to take "any meaningful steps to establish a relationship with [Child] or to regain custody over [Child] after what was supposed to be a temporary arrangement." Orphans' Court Opinion, 3/24/21, at 10. Further, the court found that Mother failed to perform her parental duties for a period of more than three years. ***Id.*** The court stated, "[M]other delayed her parental duties, hoping to find a time that was more convenient, but that ultimately led to the current situation where [M]other has gone three and a half years without performing any parental duties for [Child]." ***Id.*** The record supports the court's findings.

Y.B. testified that, after November 2017, when Mother provided full custody of Child to her and N.B. for a temporary but undefined time-period, they "never heard from her" again. N.T., 1/21/21, at 13. Y.B. clarified, "Other than the few times that our lawyers reached out to her for coming to court . . . during the custody hearing, there was no other contact with [Mother]

personally." *Id.* at 14. On cross-examination by the GAL, Y.B. testified that since Child has resided with her and N.B., Mother never provided Child with birthday presents, cards, or letters. *Id.* at 39.

Y.B. testified that she and N.B. moved to a new address in 2018, where they resided in August 2018, when they filed the custody petition. *Id.* at 24. She testified that their new address appeared on the court documents in the custody case. *Id.* at 41. Y.B. testified that the phone number of neither her nor N.B. had changed during the entirety of this case. *Id.* Y.B. stated that Mother "had all of our contact information. If she wanted to reach out to us, we did not prevent her from doing so." *Id.* at 27.

Mother testified on cross-examination by Appellees as follows:

Q.     During the timeframe that we are talking about, from 2017 to today, have you ever asked to see [Child]?

. . .

A.     From 2017? I was basically away the whole time, from 2017 to 2018. I came back to PA. Like I said, I was basically away.

N.T., 1/21/21, at 139.

Within several days after returning to Pennsylvania in December 2018, Mother became incarcerated until April 2020. *Id.* at 126-127. While incarcerated during that time-period, Mother testified that she telephoned Appellees, "but they didn't answer. There is only so many times when you're incarcerated that — you know what I'm saying? But I would call my mom. I remember speaking to [Appellees] I think one time, but [Child] was in

daycare." *Id.* at 127.  Mother clarified that, in 2019, her mother initiated a three-way telephone call between them and Appellees.  *Id.* at 132.  Mother testified that Child was in daycare at the time of the telephone call.  *Id.* Mother did not testify that she spoke to Appellees again about Child while in prison.

On direct examination, Mother testified that, upon release from prison in April 2020, she did not reach out to Appellees.  *Id.* at 130.  Specifically, she explained:

> Q. At that time when you got released, did you try to reach out to them at all when you got released from prison in the spring of 2020?
>
> A. No.  But when I finally spoke to them, I had a meeting with their lawyer.  I had a meeting with their lawyer and me.  And I . . . spoke to them . . . asking them why they [had] not tried to contact me or whatever or come to me about this matter.

*Id.*  Mother testified that the meeting was by telephone, and it occurred in September or October 2020.  *Id.* at 131.  She continued:

> Q. It's at that time you had a discussion about getting [Child] back?  Is that what you're saying?
>
> A. No.  They had a discussion.  Their lawyer was basically trying to get me to sign over my rights to [Child]. . . .
>
> Q. At that time, did you ask about the welfare of [Child]?
>
> A. They really didn't — I was trying to, but the conversation really wasn't good.

*Id.*

Mother testified that she knew Appellees had moved, but she did not know their address. *Id.* at 136. Mother explained that she did not receive paperwork for the August 2018 custody conference. *Id.* at 150. She testified that Appellees contacted her instead by telephone to tell her about the court date. *Id.* at 151. With respect to why she did not ask Paternal Aunt for the address of Appellees, Mother testified on cross-examination by the GAL as follows:

Q. And did it ever occur to you to reach out to [Paternal Aunt], who was engaging in biweekly visits with [Child], to find out where that address was?

A. Me and [Paternal Aunt], we don't – we didn't talk. [W]e had gotten into . . . something, a quarrel or whatever you want to call it, disagreements, where we had trouble communicating.

Q. But did it worry you that you didn't know the whereabouts of [Child]?

A. . . . Yeah, of course it would worry me if I don't know the whereabouts of [Child], but I knew she was with them. . . .

*Id.* at 152-153. In addition, Mother testified that she did not contact Appellees for their home address *via* social media because "I'm not a social media person." *Id.* at 155-156.

With respect to the time-period prior to her incarceration in December 2018, Mother testified that she was not permitted to contact anyone while in the Florida inpatient rehabilitation facility from November 2017, until March 2018. *Id.* at 121. Mother stated that the same prohibition applied while she was in the California inpatient rehabilitation facility from May 2018, until

December 2018. *Id.* at 123-125. With respect to whether the prohibition included letter writing, Mother testified, "I don't remember." *Id.* at 148.

While residing in the halfway house in Florida between March 2018, to May 2018, she had one specific phone conversation with Appellees. Mother testified on direct examination:

Q. You were able to make phone calls from this halfway house?

A. Yeah, I would call out. I had their number, and I would be able to talk to them. You know, I would talk to them here and there. I spoke to them. I said, what is [Child] doing for her birthday.

They told me they were having a Minnie Mouse birthday party for her, and they had bought her a Minnie Mouse cake and sent me a picture.

*Id.* at 122-123. Mother testified that she last saw Child *via* video chat through her android phone in 2018, which, as best we can discern, was the same phone call where Appellees told her they were having a Minnie Mouse birthday party for Child. *Id.* at 123, 134, 147. Child would have then been turning two years old.

Based on the foregoing testimonial evidence, we deem reasonable the following conclusion of the orphans' court that Mother's conduct warrants termination under Section 2511(a)(1):

[T]he [c]ourt finds that [Appellees] have met their burden of proof by clear and convincing evidence that [M]other has refused and failed to perform her parental duties. Additionally, [M]other has had no post[-]abandonment contact with [C]hild, other than one video call. Put simply, [M]other has offered no explanation for her conduct in failing to take steps to regain custody of or even to seek visits with [Child] and to perform the parental duties required. . . . Further, [M]other has had virtually no post-

> abandonment contact that reflects the desire on [her] part . . . to create a meaningful and secure relationship with [Child].

Orphans' Court Opinion, 3/24/21, at 15. Accordingly, Mother's first issue fails.

In her last issue, Mother argues that, assuming Appellees did not satisfy their burden of proof under Section 2511(a)(1) or (2), the court abused its discretion by considering Section 2511(b). Mother's argument fails because the orphans' court determined that her conduct warranted termination under Section 2511(a)(1) and (2). Therefore, the court properly considered Section 2511(b). *See In re L.M.*, 923 A.2d at 511 (Pursuant to the requisite bifurcated analysis, "Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.").

It is important to note that Mother provides no further discussion or citation to relevant authority with respect to Section 2511(b). Therefore, we deem waived any claim regarding Child's developmental, physical, and emotional needs and welfare under Section 2511(b). *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (stating that issues are waived if appellate brief fails to provide meaningful discussion with citation to relevant authority); *see also* Pa.R.A.P. 2119(b).

Even if not waived, we would discern no abuse of discretion by the court.

With respect to Section 2511(b), we have explained, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted). This Court has further stated, "the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)).

Here, the orphans' court found:

As established by her lack of contact with [Child], [M]other does not have a bond with [Child]. . . .

[M]other . . . spent time with and cared for [Child] for three months when Child was three to six months old and then for a few months over the [s]ummer of 2017 when [Child] was about a year old. When [Child] was one year and three months old, Y.B. and N.B. began caring for her full[-]time and [M]other has not seen or spoken to [Child] since, with the exception of one video call in 2018. Over the four and a half years of [Child's] life, [M]other has spent a total of about six to eight months with her. [M]other testified that she last saw [Child] when [Child] was two and a half

- 17 -

years old, via a video phone call, and that she does not know if [Child] would recognize her today. (N.T.[, 1/21/21, at] 138, 13-18).

. . .

The court has determined that there is no bond between [M]other and [Child] based on their limited interactions, that there would be no adverse effect on [Child] if [M]other's rights were terminated, that the only home [Child] has ever known is with Y.B. and N.B., and that therefore it is in her best interest to terminate [M]other's rights and allow [Appellees] to adopt [Child] so that she may remain in a stable and loving environment.

Orphans' Court Opinion, 3/24/21, at 22-24. The testimonial evidence supports the court's findings.

Accordingly, even if Mother did not waive her issue regarding Section 2511(b), we would discern no abuse of discretion by the court's conclusion that terminating Mother's parental rights serves the developmental, physical, and emotional needs and welfare of Child. *See In re B., N.M.*, 856 A.2d at 856 (reiterating, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment. A parent cannot protect his parental rights by merely stating that he does not wish to have his rights terminated.") (citations omitted). We therefore affirm the decree terminating Mother's parental rights pursuant to Section 2511(a)(1) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/29/2021